We'll hear now Gonzales-Reyes v. Sessions. May it please the Court, Andrew O'Toole with O'Toole & O'Toole representing Mr. Gonzales-Reyes, the petitioner in this case. Petitioner derived his citizenship from his father, who became a U.S. citizen when Petitioner was seven years old. Petitioner is married to a U.S. citizen, and together he and his wife have three U.S. citizen children, the youngest of whom is 11. Petitioner remains in the custody of ICE since he successfully completed his criminal sentence over 973 days ago. The statutory scheme of 1432A facially classifies children raised through a tool- Mr. O'Toole, I'm very sympathetic to your argument, and I understand that you're here pro bono, and I appreciate that. Would you tell me why these arguments aren't squarely- set aside for a second Morales-Santana. If we didn't have Morales-Santana, would your arguments be squarely foreclosed by Pierre in combination with Lewis? Your Honor, I don't believe squarely foreclosed, I don't believe- Forget the word squarely, foreclosed. Your Honor, I do think that Morales-Santana is the reason why they should be reexamined. So that's helpful. So we're really looking at Morales-Santana and whether it's in effect abrogated, sort of a combination of those, but primarily Pierre. Correct, Your Honor, and I do think Lewis, to an extent, as well, and I think it's a to apply the same scrutiny that the Supreme Court applied to Morales-Santana's barriers to citizenship, and when that is done- Now, of course, in Pierre, that panel, we applied intermediate scrutiny. Well, Your Honor, that's an interesting question. I think the panel sort of didn't really resolve whether or not intermediate scrutiny applied and did not resolve squarely whether or not the classification based on marital status was indeed a marital status or gender claim. It went through the rational basis. I'm not sure I can- 1432A3 would satisfy intermediate scrutiny. That's what we said in Pierre. Your Honor, it went on and said even if we were to assume intermediate scrutiny, and I guess going back to Your Honor's first question, Morales-Santana in footnote 25, the court held that intermediate scrutiny needs to be applied, and then to Your Honor's follow-up question, whether or not intermediate scrutiny is applied, I think you have to examine how Morales-Santana applied that and the vim and vigor in which Morales-Santana really pressed the government to identify the compelling interest and then also look at the fit between the articulated government interest and whether there was a means or there was a match between them. So it's not enough for the government, and I think what Morales-Santana requires this court to do is really peel the onion and really look at what the asserted interest is that the government assert. My reading of Pierre is that we did precisely that. We looked at the two primary interests, preservation of the family unit, protection of the parental rights of the alien parent, and then determined as a matter of intermediate scrutiny, whether it's primarily or in the alternative, that the scheme was narrowly tailored to satisfy those interests. Your Honor, respectfully, I think Morales-Santana calls into question some of those assumptions and presumptions that undergird 1432A. Where do we find what the underlying purposes are for this section? I mean, there's a little bit of citing of legislative history but not much in the briefs? Right, Your Honor, and I don't believe necessarily you have to find intent by the Congress. I think what you need to do under Morales-Santana is examine under today's standards and how families are organized and how fathers are involved in briefs. Your argument is that the statute is based on assumptions and stereotypes, and where do we find that? What is the support for that assertion? Your Honor, you look at the structure of 1432A, and you look at the fact that the first two provisions have to deal with when both parents are naturalized. You're looking just at the face of the statute, and is there anything else beyond the words of the statute? Well, I think there is limited legislative history, which is cited in the brief, that supports the idea, and historically, the idea that children born outside of marriage are presumed to be the responsibility of their mothers, and that fathers are absent from their lives. And I think what Morales-Santana does is show historically that that's a gender stereotype, an overgeneralization, and reflects the norms that are outmoded. The statistics demonstrate that four out of ten children are born outside of marriage. One out of five single parents are fathers. This notion, historically, which is embedded in our history, even the word illegitimate, it's pejorative. Legitimation is not an issue that's on the table in this case because there's no dispute that there was legitimation. Is that right? The government waived and abandoned any claim to legitimation. So going back to Your Honors. Do you agree that there was legitimation here? Because if so, then that provision doesn't apply at all. I mean, neither a mother nor a father would be able to pass citizenship if there is legitimation. Your Honor, I would agree, but I would say that you have to look at the entire way that the BIA and the agency has been interpreting both legitimation and under, while in this particular unique case, they're not claiming that paternity wasn't established. Isn't this an as-applied challenge? Yes, Your Honor. They're not contesting that, but I'm going back to the structure of 1432A3, and what I'm trying to focus the Court's attention on is if you look at that, it allows a married parent, a father or mother, to convey derivative jurisdiction to their child based upon custody. What does it mean in Subdivision 3 of 1432A where it reads when there has been a legal separation of the parents? If the fact that they're not married would permit your side to prevail, shouldn't the statute be changed? Isn't that the way it should happen? Not that we should completely ignore the words legal separation. Well, Your Honor, the petitioner has two arguments here. One is the legal separation, we need to look at what the asserted interest is, and then we need to look at if legal separation in the context can only be applied to married parents. So we said in Lewis? Correct. Correct. Well, it did leave open. Yes. We'll get to that. But if it only applies to married parents, then on its face, the statute discriminates based upon marital status if that separation. Then going to your other Honor's first question, you need to look at the interest that's asserted and whether there's a match. I would agree that custody would match the interest of the parent, but this artificial artifice imposes a burden of separation on unmarried parents, and that doesn't make any sense. As I.J. here found, it's impossible for separated people to be separated. You would then have to read Morales-Santana as relating not only to gender stereotypes, but marital status as well. Is that right? Well, I don't want to be suggesting that Morales-Santana resolved that. What I'm saying is the court needs to apply the same vim and vigor to the distinction that Morales-Santana was addressing as to gender. You said at the beginning this would involve an abrogation, for lack of a better term, of both Pierre and Louis. We would have to read, in connection with the Louis portion of that, Morales-Santana as broadly involving not only gender but marital status, because that's what you're in answer to just Keenan. That's your response. Well, yes, and in Morales-Santana, in that footnote 25, which was more in the section of the opinion dealing with remedy, they do make clear that the same intermediate scrutiny needs to be applied to marital status. And it's interesting if you look at what the predicament was for the Supreme Court in trying to choose that remedy. They didn't want to provide a remedy to unmarried fathers that would put unmarried parents in an advantageous situation to married parents. And that's precisely what I'm asking this court to do now, is just put married and unmarried parents in the same equal footing which the law requires. There was one, as you pointed out, a footnote in Louis in which we pointed out or alluded to a possible exception to the general rule that unmarried couples can't legally separate. And if in that case some statute in Jamaica made it clear that an unwed couple could legally separate, then we would consider that. Have you looked at whether the – I think it's the Dominican Republic here, right? Have you looked at whether the Dominican Republic has got some statute or some law that we could view as allowing unwed couples to legally separate? Yes, Your Honor. I did look, and I was not able to find any provision or procedure by which they could do so. And I would say this case could be limited to its facts, although I want to be sensitive. I'm over the time. But this case could be limited to the very facts that are presented in this petition in that the petitioner's father entered into two legal marriages in the Dominican Republic before he came to live in the United States with his father. A legal marriage constitutes a legal separation of the first unofficial marriage? That's in essence what you're arguing? Practically, it's true, Your Honor, because under both Dominican law where the marriages were entered into, it's illegal to enter into a marriage if you're still married. And there's been no showing in this record. That doesn't mean you were legally separated. But it satisfies the requirement, this concern, if the burden that's being imposed by 1432A3 is limited to married parents, then the interest. And I guess that's where I would ask the government to really identify what is the interest. I understand custody, and there's no dispute here about custody. That addresses the government's interest. And going to Judge Keenan's question, the statute was amended in 2000, and now it just requires that the parent have custody and the child come to live in the United States. So this demonstrates that whatever that compelling objective that the Congress was trying to meet in 1940 or 1952 could be met and was met when the Congress revised the statute. And they did so because they wanted to address this serious issue of someone like Mr. Gonzales Reyes, who's lived in this country for 28 years, always thought he was a U.S. citizen, and he engaged in criminal conduct. But like any of us who are American citizens, if we serve our crime, then we are allowed to rehabilitate ourselves. Thank you. We'll hear from the government. May it please the court. Stephanie Hennis for respondent. In this case, the court should deny the petition for review. As this court pointed out, it has already held that former section 8 U.S.C. 1432A3, the legal separation portion of that has a clear and unambiguous meaning. And applying intermediate scrutiny, this court has determined that it does not present an equal protection violation. Shouldn't we at least reexamine those cases in light of Morales-Santana? No, Your Honor. So because that's already binding precedent before this court, a panel would only be able to revisit its precedent due to- Well, I mean, if we were persuaded, most likely we'd have to do a mini-en banc. But my question simply is, shouldn't we at least think about it? Or are you suggesting that we're even foreclosed from considering whether Morales-Santana has any impact? You're not foreclosed at all from considering whether Morales-Santana has impact on this case. The government's position is that Morales-Santana does not have an impact on this case, such that the court needs to revisit its decisions in Lewis and Pierre. And we've laid out a few reasons for that in our brief. One would be that Morales-Santana involved a completely different statute. It also involved different government interests. And I think something that's very important in this case is that in evaluating the interests involved in Morales-Santana, the Supreme Court- If the statute, if a statute treats a man differently from a woman, then the court ought to take a good hard look at the statute. What are the reasons for the differential treatment? And whether the means employed are narrow. Yes, Your Honor. And that is not a departure from established law regarding intermediate scrutiny. That's what this court did in Pierre. But even looking at what the court did in Morales-Santana, I think it's important to recognize that the Supreme Court never distinguished its prior decision in Nguyen, which was the case that- Children born out of wedlock have fewer rights under the statute than children born in wedlock. Would you agree with that? No, because the statute doesn't discriminate based on whether you're born in or out of wedlock. It has to do with whether there was a marriage to the parents. You could have a situation where someone was- But if your parents weren't married, you would have fewer rights under the statute than if your parents were married. If your parents- Were not married. Did not ultimately marry. Well, as this court pointed out in Lewis and Pierre, the legal separation- The court did leave open the possibility that a legal separation could be affected in some jurisdictions when the parties weren't actually married. So the legal separation- Would you answer the question posed by Judge Chin? Is it a right that if you are born out of wedlock, your- Let's put it this way. Chances of having derivative citizenship are lower than if you were born to a married couple? I guess so, Your Honor. I don't- I mean, I'm trying to think of- Because there were lots of considerations in play here. That's what we're trying to get to. What is the reason for imposing different requirements for children born in wedlock and born out of wedlock? What are the reasons, the purposes? What are we trying to serve with this statute? Okay, so that's actually where I was going with part of the Supreme Court's decision in Morales-Santana. Because in that decision, it left intact Nguyen, which was a Supreme Court case that dealt with a situation similar to the one we have here, where there was a- What are the interests that are advanced, purportedly advanced by this statute in the differential treatment of children born in and out of wedlock? When the child is born out of wedlock, the idea is that when a father has not established his paternity by legitimation, that there isn't a known parent. And in that instance, this aligns with what this Court laid out in Pierre, which is that the general rule was that both parents had to naturalize in order to derive citizenship. And it was only in the context where it was fair to believe that there wasn't another parent involved. There is no dispute as to paternity. The father is the father. Why apply this in that scenario? Why apply these provisions in that scenario when there's no dispute that this is the father? Because it also- So in that instance, where there's an unmarried couple and there's no dispute as to the father, like in this case, that second provision of A3 would apply to neither parent. Neither Mr. Gonzalez-Reyes' mother nor his father would have- Then there's no gender difference. Exactly, Your Honor. Now, as to the first part of A3 where there is this requirement for a legal separation, this Court has already identified that as establishing a bright line rule to show that there is no longer a unity between the two parents such that- Now, why doesn't- I mean, Mr. Atul referred to footnote 25 of Morales-Santana, which refers to marital status. It says the same level of scrutiny applies to marital status. Of course, that was not the thrust, as I recall, of Morales-Santana. But why can't we consider that footnote as strongly suggesting that we should review this under an intermediate scrutiny regime and try to figure out or tease out what the interests are here when it comes to marital status? Because there seems to be some discrimination based on marital status. I thought that in Pierre this Court did apply intermediate scrutiny- I think so, too. Okay. But was it to marital status as well as to- I want to say that it did, Your Honor. I don't want to misspeak. But I believe that in Pierre this Court did apply intermediate scrutiny to both- Legitimacy. Yes, to both legitimacy and marital status. And once again, I think one of the things that this Court focused on in Pierre was the fact that it did leave open this ability to show that there had been a legal separation of the parties and also the plain language of the statute, which mandated- I'm also- I don't want to- Okay. So I- the Court went through the fact in Pierre, the Court went through, you know, that there was uncertainty as to the level of scrutiny to be applied, but then said there was no occasion to address that because there wasn't discrimination on the basis of a protected class. And then it also went on to satisfy the question of intermediate scrutiny. Let me get back to something that you asked about five minutes ago. Isn't the child of a couple who are not formally wed disadvantaged on the government side here? If we take the government side, if we affirm the Board of Immigration Appeal, isn't the child prejudiced and disadvantaged only because his parents or her parents were not formally wed? No, Your Honor, because the legal- well, so in this case where we do have paternity established, that takes out the second part of A3. And as to the first part, the legal separation requirement is applied universally. So even in the context of married couples, if they informally separated- The position is that if the parents were not married, there could never be a legal separation. And therefore, the first clause of Subdivision 3 cannot apply. That's the government's position, correct? I mean, that's what this Court said in Lewis and Pierre, though I do recognize that you left open- Then the question is, in light of Morales-Santana, we should be looking at the reasons for that differential treatment, whether it still makes sense today, and whether there might be a narrow way of advancing those interests. Is that not the proper analysis under Morales-Santana? Well, I see that I'm out of time, but I will- Okay, you can answer. In Morales-Santana, again, it was applying the intermediate scrutiny that this Court already applied in its prior decisions. That doesn't break new ground in the Equal Protection Law. It reiterates- What is the interest for treating, in that scenario, the children born out of wedlock differently? Is that there- And this Court described this in one of its prior decisions, that it did establish a bright-line way of showing that the parents were no longer together in a formal way. This was the rationale for another one of this Court's decisions, Brissett, which dealt with a married couple. And there was an informal separation of the parties. So what I'm hearing is the reason is it's a way to show, a bright-line way of showing that the parents are indeed separated. Is that a sufficient reason? And would there be a narrower way of accomplishing that purpose? I don't know that there's a narrower way that Congress would have wanted under the law as it existed then. Your Honor, opposing counsel brought up the fact that the law has since been amended so that generally someone can derive citizenship through only one parent. But when Congress did that, it chose not to apply that retroactively. So it only applies to citizenship claims that vested from 2000 going forward. I thought that part of the reason, or part of the interest, was to protect the rights of the alien parent. Yes, Your Honor. And that that was why they had Congress introduce this legal separation element. Yes, Your Honor. Can you explain that? So, thank you for bringing that up, Your Honor. That went toward the idea of the entire statutory scheme here. Which made, generally, derivative citizenship was only available as an automatic benefit when both parents naturalized. And there were these two exceptions. One where the other parent was deceased. And then these provisions in A3. And because citizenship was automatic, the idea was that Congress wanted to preserve the rights of the alien parent when the alien parent was still in the picture. And so that's where this court previously has focused on the fact that there was a provision that would have allowed Mr. Gonzalez-Reyes' father to apply for him to obtain citizenship through his father's naturalization. But he didn't end up doing that in this case. So, read together, the idea was that Congress was trying to preserve the rights of the alien parent who may not actually want the child to become a citizen. And because derivative citizenship under this provision was automatic, it only afforded that when both parents naturalized. And this is in line with what this court has previously held in Pierre. Thank you. Thank you, Your Honors. We'll hear the rebuttal. Thank you, Your Honors. Just briefly, I just wanted to address the Wynn case that the government raised. Wynn dealt with a different provision. And the difference of Wynn is that that dealt with more of this idea of the way that you could legitimate. And in there, it's also important to remember the Supreme Court looked at that it was a minimum burden under that statute because in that statute, you could establish paternity by legitimation or simple acknowledgement. So, the real criteria and the standard this court needs to apply is whether the classification imposed here. It's odd that Justice Ginsburg, having the opportunity, I thought, since I was somewhat familiar with Morales-Santana. Well, the court cites Wynn not with disaffirmation, but it cites it and it appears, if you're reading the opinion, to remain good law. Well, I think it is good law to the extent. So, you're making a separate point. My point is that you can't just say there's a legitimate objective in this one area of the immigration statute, which we all agree is complex and messy, and they identify it. And then there's a criterion imposed or a classification imposed there. And then say, just because they applied intermediate scrutiny, it's satisfied everywhere. And my point is this. It's very nuanced. In Wynn, the requirement they were looking at was that under that statute, which is different than this, which this statute is even more onerous on establishing paternity. You've got to do it through legitimation, which they've got a very onerous standard under that. It's got to be equivalency between unmarried and married parents. But that's not in this case. My point is just in Wynn, the Supreme Court was really looking at that it was a minimum burden to require a parental acknowledgement. And so my point is the government gets up here, talks for a long period of time, doesn't identify the objective. Your Honor raises the objective that they proffered in Pierre. It's really important in light of Morales. You can't just accept post hoc rationalizations. They've got to be legitimate. Well, assuming that that was the interest that was provided by the government in Pierre. Well, perhaps it was. That panel didn't just divine it or come up with it, but okay. Well, it was proffered. And I would also just say, too, that if you really go back to the cases, and even Pierre, and you trace back the ones that have looked at this discrimination in this 1432A, a lot of the precursor cases did not apply intermediate scrutiny but applied the rational basis. And then the courts that said that they were applying intermediate scrutiny follow those courts. So this goes back to my point I made in my opening. You really need to peel back and really put the government to articulating what is the objective. And I would say respectfully, if the objective is the rights of the alien parent, that is satisfied by the custody requirement that could be imposed under 1432A.3, which is satisfied in this case and is also what Congress adopted when they changed the statute in 2000. So I would say the means to address the rights of the alien parent are met by the custody requirement that's imposed by the statute. But let's go back to what is the reason that you would need legal separation. It's to establish separate legal existences. That doesn't advance this asserted government interest that we hear. And so I think the means of achieving that can be achieved in a less onerous, without imposing an undue burden on an unmarried parent. For all these reasons, Petitioner requests that the order of removal be vacated. And following this Court's example, J.N. would request that he be released from ICE custody as quickly as possible. Thank you. Mr. O'Toole, thank you for taking on the case, and I thank both sides for doing an excellent job. Okay.